483 S.E.2d 507

**Chandra K. PARKULO, Plaintiff Below, Appellant**

v.

**WEST VIRGINIA BOARD OF PROBA-TION AND PAROLE and the West Virginia Division of Corrections, Defendant Below, Appellees.**

No. 23366.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Nov. 15, 1996.

Rehearing Refused Feb. 11, 1997.

John F. Parkulo, Anderson, Parkulo, Stansbury & Associates, L.C., Beckley, and David L. White; White, Smith, Morgan & Scantlebury, L.C., Bluefield, for Appellant.

David P. Cleek, McQueen, Harmon, Potter and Cleek, Charleston, for Appellee, West Virginia Board of Probation and Parole.

Cheryl Lynne Connelly, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, for Appellee, The West Virginia Division of Corrections.

ALBRIGHT, Justice:

Appellant, Chandra Parkulo, is appealing [1] a final order of the Circuit Court of Cabell

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme

County, West Virginia, granting summary judgment to the West Virginia Division of Corrections and the West Virginia Board of Probation and Parole, refusing to grant a motion for reconsideration of an earlier order dismissing the action on the motion of the West Virginia Board of Probation and Parole, and refusing to grant a motion by appellant to file an amended complaint, all for the reason that the trial court considered appellant's civil action barred by the so-called "public duty doctrine" and considered that appellant did not meet the requirements of the so-called "special relationship" exception to that doctrine. After reviewing the record, we find that, on common-law principles, the Board of Probation and Parole may claim quasi-judicial immunity and the West Virginia Division of Corrections may claim the benefit of the public duty doctrine. However, we further find that there is insufficient evidence regarding whether the insurance applicable to this action, acquired by the State Board of Insurance (Risk and Insurance Management) of West Virginia, waived either or both of these defenses. Therefore, we reverse and remand for a determination as to whether the State's insurance contract provides coverage notwithstanding the availability of these defenses.

## FACTS

Late on the evening of February 9, 1992, as appellant was walking across the campus of Marshall University in Huntington, West Virginia, she was hit and knocked to the ground by a vehicle being driven by Emmitt Dawson McCrary, Jr., a convicted criminal who had been released from prison. McCrary then struck appellant in the head with a blunt object and dragged her into the vehicle, which McCrary then drove from the scene. Following the abduction, McCrary repeatedly raped appellant, sexually assault-

ed her with a screwdriver, beat her, and eventually left her nude beside the roadway near the West Virginia–Kentucky state line. A passing motorist observed her, rescued her, and took her to the hospital, where she underwent treatment for the physical injuries she sustained. McCrary, later arrested in Boyd County, Kentucky, was tried for the crimes involving appellant and sentenced to prison. He subsequently died there. According to appellant, at the time McCrary committed the crimes involving appellant, he had been released from prison by the West Virginia Board of Probation and Parole and was then under parole supervision by the West Virginia Division of Corrections.

Appellant brought this action in January, 1994, naming as defendants the West Virginia Board of Probation and Parole (the "Board" or the "Parole Board")[2] and the West Virginia Division of Corrections ("Corrections" or the "Division of Corrections").[3] Appellant's complaint sought recovery from the two public bodies, as entities, and did not seek recovery against their respective officers or employees. The complaint alleged that the Board, in granting McCrary parole, and the Division of Corrections, in supervising McCrary while he was on parole, violated their respective statutory duties, acted outside the scope of their respective official responsibilities, and, through their respective employees, acted negligently, in bad faith, and in a wanton and reckless manner. As a proximate result, the complaint alleged, appellant was injured, for which she sought damages. Appellant subsequently served a motion to amend the complaint, but the record does not reflect the proposed amendments.

On March 1, 1994, the Parole Board filed a motion to dismiss, assigning multiple grounds. It appears that the motion was

Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

**2.** The Board is an instrumentality of the State of West Virginia, created by law. Until 1994, the Board was known as the West Virginia Board of Probation and Parole. Effective June 10, 1994, the name of the Board was changed to the "West Virginia Parole Board". W.Va.Code § 62–12–12 (1994).

**3.** The Division of Corrections is an instrumentality of the State of West Virginia, created by law. It was and is a part of the Department of Military Affairs and Public Safety. *See,* W.Va.Code § 5F–1–2 (1992), W.Va.Code § 25–1–1 (1977), and W.Va.Code § 5F–2–1(e)(7) (1992; 1995).

treated as a motion under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. The Parole Board asserted that it was immune from suit because its function in granting or denying parole is judicial or quasi-judicial in nature and asserted that the employees of the Board were acting in the scope of their authority. On March 10, 1994, the Division of Corrections served its answer, which, in addition to denying substantive allegations of the complaint, raised several affirmative defenses, including the doctrine of sovereign immunity, the doctrine of qualified immunity, the doctrine of quasi-judicial immunity, lack of duty owed to the plaintiff, and lack of subject matter jurisdiction.

By letter of February 1, 1995, the circuit judge advised counsel of his decision on the Parole Board's motion to dismiss. The body of the opinion letter reads as follows:

> I am of the opinion to grant the *defendant's* Motion to Dismiss the plaintiff's complaint. I am of the opinion that the act of granting parole is a judicial or quasi-judicial function and that there is absolute immunity from liability *as to each of these defendants.* Counsel for the *defendants* is to prepare an Order reflecting the Court's decision. Such Order should reflect the plaintiff's objection to the Court's ruling in this matter. (Emphasis added.)

The consequent order granting the Parole Board's motion to dismiss was entered on April 12, 1995. The order stated, in relevant part:

> On the 21st day of June, 1994, came the parties by counsel, for hearing on the Motion to Dismiss heretofore filed by *defendants* and the responses and briefs filed by the parties [sic] is of the opinion to grant said Motion to Dismiss on the ground of

immunity, judicial or quasi-judicial, which is more fully set forth in the Court's letter opinion of February 1, 1995, which is incorporated herein and attached as an exhibit to this Order.

> It is therefore, ORDERED that the Motion to Dismiss be granted with prejudice on the grounds of immunity alleged therein and that this case be dismissed from the docket of this Court. (Emphasis added.)

On Monday, April 24, 1995, appellant served a motion asking the trial court to reconsider its order of dismissal. Appellant complained that the order dismissed the Division of Corrections even though Corrections had not moved for dismissal and that the trial court's grounds for dismissing the case had not been adequately articulated. Thereafter, on August 14, 1995, the Division of Corrections filed a motion for summary judgment, arguing that, pursuant to the public duty doctrine, Corrections had no duty to protect appellant. After the hearing, the trial court, by order entered September 15, 1995, denied appellant's motion for reconsideration, denied appellant's earlier motion to amend her complaint, and granted the motion of the Division of Corrections for summary judgment, stating:

> I am of the opinion that her [appellant's] cause of action against the *defendants* must be dismissed as a matter of law. The plaintiff does not meet the requirements of the "special relationship exception." Her claims are barred by the Public Duty Doctrine. There was no duty owed by either of the defendants to this particular plaintiff and, therefore, no breach of such duty occurred. (Emphasis added.)

It is from this order of September 15, 1995, that appellant appeals.[4]

4. By way of cross assignment of error, appellee Board challenges the jurisdiction of this Court to hear the appeal, believing it to be untimely. We disagree.

The petition for appeal was filed in the Circuit Court of Cabell County on January 3, 1996, within four months of the entry of the order on September 15, 1995, denying the "motion for reconsideration" and granting summary judgment as to all defendants. The running of the time for appeal from the order entered April 12, 1995, dismissing the case from the docket, was tolled by the timely filing of the "motion for reconsideration". We treat that "reconsideration" motion as a motion under Rule 59(e) of the West Virginia Rules of Civil Procedure, since the tenth day following the entry of the order it addresses fell on a Saturday and the motion was served on the following Monday. Therefore, even if the order of April 12, 1995, is read as unintentionally dismissing both parties rather than just the movant, both the order of April 12, 1995, and the order of September 15, 1995, are before us because (1) appeal was filed within the applicable four-month period for both orders, after tolling is given effect, and (2) in any event,

## STANDARD FOR REVIEW

■ It appears that after the hearing on appellant's motion to reconsider the order entered April 12, 1995, on her motion to file an amended complaint, and on the Division of Corrections' motion for summary judgment, the trial court's order of September 15, 1995, can best be characterized as a grant of summary judgment as to both the Board of Probation and Parole and the Division of Corrections. Accordingly, our standard for review is *de novo.* " 'A circuit court's entry of summary judgment is reviewed *de novo.*' Syllabus point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994)." Syl. pt. 9, *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996).

## ASSIGNMENTS OF ERROR

Appellant, Chandra K. Parkulo, assigns two errors. She contends that the lower court erred in finding that appellee Parole Board enjoys judicial immunity. She also asserts that the lower court erred in finding that recovery may not be had against appellee Division of Corrections by reason of the so-called "public duty doctrine." These assignments raise two distinct legal concepts on which appellees and their insurer or insurers successfully based their defense below:

(1) That the Appellees, as instruments of the State, are entitled to claim some form of governmental immunity arising from the common law independently of the sovereign immunity granted the State by our Constitution, and

(2) That the Appellant can not maintain an action in negligence for any breach of Appellees' duties to enforce regulatory and penal statutes, because such duty is owed to the public generally and not to a particular person harmed by any such breach.

## CONSTITUTIONAL IMMUNITY AND THE LIMITED STATUTORY BASIS OF ANY LIABILITY.

We begin our discussion by reviewing the limited statutory basis for the exercise of jurisdiction by the courts of this State over any claim against that State and its agencies. Article VI, § 35 of the West Virginia Constitution grants immunity from claims against the State. That section states, in part: "The State of West Virginia shall never be made defendant in any court of law or equity[.]" As noted above, appellees, the Parole Board and the Division of Corrections, defendants below, are instrumentalities of the State.[5]

---

the timely appeal of an order finally disposing of all claims as to all defendants brings with it all prior orders.

Rule 59(e) of the West Virginia Rules of Civil Procedure provides: "A motion to alter or amend the judgment shall be served not later than ten days after entry of the judgment."

Rule 6(a) of the West Virginia Rules of Civil Procedures provides, in applicable part: "In computing any period of time prescribed or allowed by these rules, by the local rules of any court, by order of the court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday or a legal holiday...."

In syllabus points 6, 7, and 8 of *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996), this Court stated:

6. " 'Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.' Point 2, syllabus, *Lloyd v. Kyle*, 26 W.Va. 534 [1885]." Syllabus point 5, *State ex rel. Davis v. Iman Mining Co.*, 144 W.Va. 46, 106 S.E.2d 97 (1958).

7. "A motion for reconsideration filed within ten days of judgment being entered suspends the finality of the judgment and makes the judgment unripe for appeal. When the time for appeal is so extended, its full length begins to run from the date of entry of the order disposing of the motion." Syllabus point 7, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995).

8. An appeal may be taken from a final order disposing of a motion under Rule 59(e) of the West Virginia Rules of Civil Procedure at any time within the appeal period provided by the entry of the order or within any proper extension of the appeal period.

Rule 3(a) of the West Virginia Rules of Appellate Procedure permits the appeal of a final order within four months of its entry.

5. *See* notes 2 and 3 above.

This Court has long held that Article VI, § 35 of the State Constitution grants sovereign immunity to the State and that the agencies and instrumentalities of the State are entitled to the benefit of that immunity.[6] Accordingly, under the traditional view, the claims giving rise to this appeal may not be prosecuted in the courts by reason of the sovereign immunity of the State. Under that view, the remedy available to appellant, if any, would be to seek a recognition by the Legislature of her claim as a moral obligation of the State pursuant to W.Va.Code § 14–2–1, *et seq.*, or W.Va.Code § 14–2A–1, *et seq.*, and the procedures employed prior to the enactment of those articles of the Code.

However, in addition to providing a method of redressing claims against the State as moral obligations of the State, the Legislature has also authorized the purchase of liability insurance providing coverage of State "property, activities and responsibilities", in spite of the fact that the State was and is immune from suit in the law courts of the State. *See* Ch. 96, Acts of the Legislature, 1957, and W.Va.Code § 29–12–5, as thereafter amended and reenacted. In *Pittsburgh Elevator v. W.Va. Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), the Court addressed the interaction of the insurance coverage within the State's sovereign immunity. In syllabus point 2, the Court concluded, "[s]uits which seek no recovery from state funds, but rather allege that re-covery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Later, in syllabus point 1 of *Eggleston v. W.Va. Dept. of Highways*, 189 W.Va. 230, 429 S.E.2d 636 (1993), this Court analyzed the State's statutory authority to purchase liability insurance and a litigant's consequent ability to maintain an action in the courts of this State for recovery under that insurance despite the State's immunity, as follows:

W.Va.Code, 29–12–5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits."

We reiterated this position in *State ex rel. W.Va. Dept. of Transportation, Highways Division v. Madden*, 192 W.Va. 497, 500, 453 S.E.2d 331, 334 (1994) (per curiam), where we said, "these cases stand for the proposition that coverage for such liability accruing from alleged negligent acts by the State is covered by the limits of the State's liability insurance coverage and not state funds."

6. *Mahone v. State Road Commission*, 99 W.Va. 397, 129 S.E. 320 (1925) (holding that the State Road Commission of West Virginia is a direct governmental agency of the State and cannot be sued); *Schippa v. West Virginia Liquor Control Commission*, 132 W.Va. 51, 53 S.E.2d 609 (1948), *cert. denied*, 337 U.S. 914, 69 S.Ct. 1154, 93 L.Ed. 1724 (1949) (the State Liquor Control Commission is an agency of the State and is immune from suit); *Hesse v. State Soil Conservation Committee*, 153 W.Va. 111, 168 S.E.2d 293 (1969) (the State Soil Conservation Committee is an arm of the State, acting in its behalf, and is immune from suit); *State ex rel. Gordon v. State Board of Control*, 85 W.Va. 739, 102 S.E. 688 (1920) (a mandamus proceeding to compel the State Board of Control, now the State Commissioner of Public Institutions, to perform the covenants of a contract made between it and a contractor is virtually one against the State and cannot be maintained); *City of Charleston v. Southeastern Construction Company*, 134 W.Va. 666, 64 S.E.2d 676 (1950) (the state office build-ing commission is a state agency and is, therefore, immune from suit); *State ex rel. C & D Equipment Co. v. Gainer*, 154 W.Va. 83, 174 S.E.2d 729 (1970) (the State Office Building Commission, now called State Building Commission, is a State agency and is immune from suit); *City of Morgantown v. Ducker*, 153 W.Va. 121, 168 S.E.2d 298 (1969) (the Board of Governors of West Virginia University is a State agency and, as such, is an arm of the State and is immune from suit to enforce payment of a claim against such board); *Hamill v. Koontz*, 134 W.Va. 439, 59 S.E.2d 879 (1950) (a proceeding by a taxpayer against the tax commissioner to recover a judgment, payable from available funds in the State treasury for taxes erroneously paid, is a suit against the State and cannot be maintained); *G.M. McCrossin, Inc. v. West Virginia Board of Regents*, 177 W.Va. 539, 355 S.E.2d 32 (1987) (the Board of Regents, as a State agency, is constitutionally immune from contractual and tort claims).

The statutory provision applicable to this action, authorizing the purchase of such liability insurance by the State, W.Va.Code § 29–12–5(a) (1986),[7] provided as follows:

> The board [of risk and insurance management] shall have general supervision and control over the *insurance of all state* property, *activities and responsibilities,* including the acquisition and cancellation thereof; determination of amount and kind of coverage, including, but not limited to, deductible forms of insurance coverage, inspections or examinations relating thereto, reinsurance, and any *and all matters, factors and considerations entering into negotiations for advantageous rates on and coverage of all such state* property, *activities and responsibilities.* Any policy of insurance purchased or contracted for by the board shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the state of West Virginia against claims or suits; *Provided, That nothing herein shall bar the insurer of political subdivisions from relying upon any statutory immunity granted such political subdivisions against claims or suits* .... [The board] shall endeavor to secure *the maximum protection against loss, damage or liability* to state property and *on account of state activities and responsibilities by proper and adequate insurance coverage through the introduction and employment of sound and accepted methods of protection and principles of insurance* ....
> (Emphasis added.)[8]

Accordingly, it appears that, notwithstanding the sovereign immunity of the State, appellant is entitled to maintain an action against the Parole Board and the Division of Corrections seeking recovery under and up to the limits of the State's liability insurance coverage, for loss or damage on account of State activities and responsibilities, provided that the State Board of Insurance (Risk and Insurance Management) has acquired that "kind of coverage," which would afford recovery under the circumstances of this case. In attempting to determine whether appellees in the present proceeding are insured with respect to the State activities and responsibilities which are the subject of this action, we have examined the record before us, including the complaint and the motion for an amended complaint, and the State register of regulations. Unfortunately, the record before us is silent regarding, and we find no applicable regulations which speak to, the scope of coverage or the contractual exceptions to that coverage. In short, we cannot determine, on the record before us, whether appellant's action is or is not within the exception to the constitutional sovereign immunity of the State sanctioned by our ruling set forth in syllabus point 1 of *Eggleston, supra.*

■ We are advised by the representations of counsel during oral argument that some specie of insurance coverage indeed exists relating to the Parole Board and the Division of Corrections. Reluctantly, we will proceed to analyze the errors assigned by the parties on the premise that nothing contained in the applicable policy or policies expressly addresses the issues appealed. We recall and emphasize here that *Pittsburgh Elevator* approved only those suits against the State which "allege that recovery is sought under and up to the limits of the State's liability insurance coverage," acquired under the authority of W.Va.Code § 29–12–5. We emphasize that in actions such as the one before us, the pleadings should state that qualification, limiting the relief sought to the coverage actually provided by the applicable insurance policies. Ideally, the text of the applicable insurance coverages afforded, including any applicable contractual exceptions or limitations contained in the policies, should be included in the record at an early stage of the proceedings so that the trial court can readily determine whether, and to what ex-

---

7. West Virginia Code § 29–12–5 was amended in 1996, but the amendments do not appear to be material to the matters under discussion.

8. The statute further provides that the cost of the insurance is to be determined by the State Board of Insurance (Risk and Insurance Management) and shall be paid by the political subdivision or the organization that is insured and provides further for the promulgation of regulations governing the procurement of the insurance contemplated by the statutory enactment.

tent, claims and causes of action pleaded are made subject to litigation in the courts by reason of W.Va.Code § 29–12–5 and the applicable insurance policy or policies. In the future, this Court will not review suits against the State brought under the authority of W.Va.Code § 29–12–5 unless it is alleged that the recovery sought is limited to the applicable insurance coverage and the scope of the coverage and its exceptions are apparent from the record. Upon remand of this action, if it is to proceed, appellant should be permitted to promptly amend her pleadings to include the necessary allegation limiting the relief sought to the insurance coverage and appellees should promptly provide the applicable coverage terms and contractual exceptions.

## RECONCILING THE CONCEPTS OF COMMON LAW GOVERNMENTAL IMMUNITIES, THE PUBLIC DUTY DOCTRINE, AND THE INSURANCE EXCEPTION TO CONSTITUTIONAL IMMUNITY

As noted above, appellees successfully relied below on claims of governmental immunity arising from the common law independently of the sovereign immunity of the State. Specifically, the Parole Board asserted there, and asserts here, that it was clothed with quasi-judicial immunity. Appellant argues here that any judicial or quasi-judicial immunity founded on the common law protects only against the personal liability of the public official entitled to the immunity. Appellant also argues that, in any event, such common-law immunities as may apply protect only local governments, not the State government. The essence of appellant's position, as we discern it, is that, given the direction of W.Va.Code § 29–12–5 for the State to purchase liability insurance on "all state . . . activities and responsibilities," any judicial or quasi-judicial immunities found in the common law do not inure to the benefit of the State (at least to the extent of its insurance coverage).

We must now determine whether the State and its insurers may claim the benefit of immunities found in the common law in a W.Va.Code § 29–12–5 action where the applicable insurance contract is silent on the issue. We recognize that the task we face puts us on a "slippery slope." On the one hand, the Legislature has enacted W.Va. Code § 29–12–5 to provide some level of redress in the courts to those allegedly injured by the actions of the State, limited to the insurance coverages thus made available. While the statute expressly authorizes local governments (political subdivisions) to claim the benefit of "statutory immunities" and expressly prohibits the assertion of constitutional immunity, it is silent on common-law immunities. Moreover, the obvious intent of the statute to provide some redress in the courts for those injured by State action could be totally or substantially defeated by an overbroad extension of common-law immunities to all State agency "activities and responsibilities." Further, the State Board of Insurance (Risk and Insurance Management) is clearly clothed with the authority to tailor the coverages and exceptions to those deemed necessary to the protection of the State and those wishing to assert a claim against it.

In light of those considerations, it may be argued that this Court should not reduce by judicial construction the protections it appears that the statute and the resulting insurance provide. In short, it is deceptively inviting to conclude that no common-law immunities apply which are not expressly set out in the State's insurance policies, and that a private action should therefore lie for the breach of any duty by any agency or instrumentality of the State. Under that analysis, in the absence of immunities and other defenses unique to the status of a prospective defendant as an instrument of government, a private suit might lie against the Legislature—if not legislators—for any number of real or imagined deficiencies in legislation, appropriations, or other actions, or against the courts—if not the judges and other quasi-judicial officers—for any negligence alleged in the judicial processes and against a variety of public offices, agencies, or instrumentalities, so long as the alleged wrong is covered by insurance and not expressly excluded by the terms of the policy or policies.

Our consideration of this dilemma has prompted a review of the leading cases in this State relating to governmental immunity. We have a paucity of cases applying or considering common-law immunities of the State or its instrumentalities, as entities, because the State has long enjoyed constitutional immunity against suit. To be sure, we have some jurisprudence dealing with the personal liability of State officers for alleged negligence in the performance of official duties, but relatively little law dealing with actions against the entities and public offices comprising the State government. However, we have a considerable jurisprudence involving the common-law immunities of local governments, especially since the landmark case of *Long v. The City of Weirton,* 158 W.Va. 741, 214 S.E.2d 832 (1975). In an effort to perceive what common-law immunities, if any, apply to the State and its instrumentalities in actions brought under W.Va.Code § 29–12–5, it is useful to look at the highlights of the modern development of that law and recent cases relating to so-called qualified or official immunity of State officers from personal liability for alleged wrongs in the performance of or related to their duties.

In 1974, in *Higginbotham v. City of Charleston,* 157 W.Va. 724, 204 S.E.2d 1 (1974), *overruled on other grounds, O'Neil v. City of Parkersburg,* 160 W.Va. 694, 237 S.E.2d 504 (1977), this Court held that Art. VI, § 35 of the West Virginia Constitution, granting sovereign immunity to the State, does not apply to municipalities. Instead, a unanimous Court said that cities could be held liable in private actions for failing to repair and maintain its streets and sidewalks, in violation of a State statute, W.Va.Code § 17–10–17, found by the Court to impose a duty to repair and maintain. Chief Justice Caplan said in that opinion that even if cities were immune at common law, the statute imposed liability on the city for the pleaded violation of it.

A short time later, in *Long v. City of Weirton,* 158 W.Va. 741, 214 S.E.2d 832 (1975), this Court recognized that it had long followed a general rule that the municipalities of this State enjoyed a broad immunity for "governmental" functions. The case then before the Court resulted from personal injuries received incident to an explosion occurring after a gas line buried in a city street was exposed by third parties doing construction work. The line was hit by a workman operating machinery, causing a gas leak that was immediately reported to the city and the gas company. Neither responded promptly, and the explosion ensued, injuring a young girl. After trial, a jury verdict was returned against the gas company, but the city was exonerated by the trial court on the basis of immunity from suit for "governmental functions." The gas company appealed, seeking to impose shared liability on the city. In a scholarly unanimous opinion by Chief Justice Haden, the Court held in syllabus point 10, "[t]he rule of municipal governmental immunity is now abolished in this State." In syllabus point 11, the Court also held that "[a] municipal corporation shall be liable, as if a *private person,* for injuries inflicted upon members of the public which are proximately caused by its *negligence* in the performance of functions assumed by it." (Emphasis added.)

The opinion traced the history of the rule of municipal governmental immunity, demonstrating that although the rule had been said to have arisen from the common law, it had not in fact been adopted by the Commonwealth of Virginia until 1867, after the creation of this State. The Court concluded that, notwithstanding some West Virginia cases that appeared to apply common-law governmental immunity to municipalities, the rule previously recognized was not a part of the common law of Virginia at the time of the creation of this State. Therefore, the Court concluded, this Court shared with the Legislature the power to modify our prior holdings on municipal governmental immunity. Commenting that *Higginbotham* effectively overruled prior cases treating the State's constitutional immunity as delegated to the cities, the Court strongly disapproved and abolished the prior distinction permitting actions against cities for "proprietary" functions but prohibiting such actions for "governmental" functions. Two facets of the opinion are particularly noteworthy for our current purposes: (1) The determination that municipal governmental immunity was subject either to

judicial or legislative modification, and (2) the holding that cities might be subject to suit "as if a private person." *Long,* 158 W.Va. at 784, 214 S.E.2d at 859. We discern, as noted later in this opinion, that subsequent decisions by this Court may be read as narrowing the sweep of that language by the application of the public duty doctrine.

The thrust of *Long* was applied to suits against other organs of local government in succeeding opinions by this Court. In *Ohio Valley Contractors v. The Board of Education of Wetzel County,* 170 W.Va. 240, 293 S.E.2d 437 (1982), the abolition of common-law governmental immunity was extended to county boards of education. In *Gooden v. County Commission of Webster County,* 171 W.Va. 130, 298 S.E.2d 103 (1982), the abolition of common-law governmental immunity was extended to county commissions. In *Gooden,* the Court employed parallel language with that found in *Long:* "A county commission shall be liable, *just as a private citizen,* to members of the general public, for injuries proximately caused by the negligence of its employees performing their duties." Syl. pt 2, in part, *Id.* (emphasis added). The apparent cumulative effect of these cases was to abolish governmental immunity for local governments in West Virginia.

Notwithstanding the apparent total abolition of the doctrine of governmental immunity for local governmental units in West Virginia, this Court has limited the effect of that ruling by invoking the so-called "public duty doctrine." *Benson v. Kutsch,* 181 W.Va. 1, 380 S.E.2d 36 (1989), involved the alleged negligence of the City of Wheeling in failing to inspect an apartment occupied by the plaintiffs for compliance with the city building code, particularly in failing to find and report the absence of required smoke detectors. The suit alleged that a fire resulted in damage to the plaintiffs which might have been avoided had the city conducted the inspections and enforced its building code. This Court examined the "public duty doctrine" for the first time, perhaps, the Court explained, because prior to *Long* cities enjoyed immunity for all "governmental" functions. Prior to *Long,* the Court recalled,

cities could be held liable only for "proprietary functions" and violations of statutes which imposed a duty on the city. Therefore, the Court concluded, "municipal governmental immunity foreclosed suit and there was little occasion to utilize the [public duty] doctrine" before then. Noting that the Wheeling building code did not operate to impose a separate statutory duty of inspection on the City of Wheeling, the Court defined the public duty doctrine as providing "that a governmental entity is not liable because of its failure to enforce regulatory or penal statutes." Syl. pt. 1, in part, *Benson v. Kutsch, Id.* This doctrine, the Court said, is not a theory of governmental immunity, "although in practice it achieves much the same result." *Id.* at 2, 380 S.E.2d at 37.

■ We recognize that the "public duty doctrine" does not rest squarely on the principle of governmental immunity, but rests on the principle that recovery may be had for negligence only if a duty has been breached which was owed to the particular person seeking recovery. Nevertheless, *Benson* and subsequent cases applying the "public duty doctrine" may be fairly seen as narrowing the holdings of *Long, Ohio Valley Contractors, Inc.,* and *Gooden* that local governments would be subject to suit "*as if a private person*" and "*just as a private citizen.*" The linchpin of the "public duty doctrine" is that some governmental acts create duties owed to the public as a whole and not to the particular private person or private citizen who may be harmed by such acts. Therefore, the nature of the defendant as a governmental entity is invoked, which operates to distinguish the defendant from "a private person" or a "private citizen."

■ In *Benson,* the Court also discussed the "special relationship" exception to the public duty doctrine. The Court determined that no "special relationship" existed under the facts of the case, although it discussed, without overtly adopting, factors other courts had considered in determining whether a "special relationship" existed. In keeping with the position advanced by appellant in the case *sub judice,* the thrust of the exception as recognized in *Benson* is that, given certain circumstances, courts may find that

such a "special relationship" has been created between the public body and a particular private citizen so that the public body may be said to owe a duty to that particular private person, in addition to and apart from any duty owed the public in general. In short, utilizing the principle of negligence law that one may only recover for the breach of a duty owed that person, the Court adopted a doctrine which provided the functional equivalent of governmental immunity for local governmental units, absent the circumstances necessary to create a "special relationship." In place of the traditional inquiry as to whether the conduct alleged in a given law suit against a local government was "governmental" or "proprietary," the inquiry after *Benson* appears to be whether the circumstances create a "special relationship" between the local governmental unit and the plaintiff.

The public duty doctrine was developed further in *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307 (1989). In that case, the city fire department failed to respond to several calls for assistance from a home owner living outside the city limits who had, perhaps inadvertently, been billed for and had paid the city a fire fee. The home for which the fee had been paid caught fire, and the fire department would not respond under circumstances which indicated that a prompt response would have greatly reduced the damage from the fire. After a devastating fire which virtually destroyed the home, the City of Wheeling attempted to return the incorrectly assessed and collected fee. The homeowner refused to accept the return of the fee and sued the City for negligence in responding to the fire. The trial court certified questions to this Court regarding the public duty doctrine. This Court reiterated its adoption of the "special relationship" test, saying that the duty to fight fires and provide police protection runs to all citizens and raises no liability to a particular individual for the failure to do so, absent a "special duty" to do so.

In *Wolfe*, a four-point test for the existence of a "special relationship" was adopted: "(1) [A]n assumption by the local governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking." Syl. pt. 2, in part, *Id.* In syllabus point 3 of *Wolfe*, the Court held expressly that the applicability of the special relationship exception to the public duty doctrine would often be a question of fact. Finally, the Court recited that the doctrine and its exception applied to suits involving "non-discretionary" functions of city government. The Court did not discuss in detail its perceived distinction between "non-discretionary" and "discretionary" functions but did note, in keeping with the line of authority begun by *Higginbotham*, that the liability of city governments might also be predicated on "a distinctive statutory duty," in addition to those arising from "non-discretionary" governmental functions. *Wolfe*, 182 W.Va. at 258 n. 8, 387 S.E.2d at 312 n. 8.

Finally, we turn to a highly instructive opinion rendered by Justice McHugh in *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 412 S.E.2d 737 (1991). In that case, a claim was asserted against the City of Fairmont Police Department for failing to respond to and protect a citizen who had called the police department asking for help because a person, who later killed her, had harassed and threatened her and she feared for her safety. The Court upheld the constitutionality of the Local Governmental Tort Claims and Insurance Reform Act, W.Va.Code § 29–12A–1, *et seq.*, against claims that it denied remedies at law guaranteed under our State Constitution and violated equal protection. It construed the "immunity" provided in W.Va.Code § 29–12A–5(a)(5) against suits for failure to provide adequate police, law enforcement, or fire protection as stating the common-law public duty doctrine with respect to those functions and determined that, notwithstanding the "immunity," the "special relationship" exception applied and the city was subject to suit if such a "special relationship" were proven. In reaching the conclusion that this particu-

lar "immunity" invoked the public duty doctrine and could be overcome by the showing of a "special relationship," the Court relied, at least in part, on "the general rule of construction in governmental tort legislation cases favoring liability, not immunity: [U]nless the legislature has clearly provided for immunity under the circumstances, the general common-law goal of compensating injured parties for damages caused by negligent acts must prevail." 186 W.Va. at 347, 412 S.E.2d at 748.

In *Randall,* the Court restricted the public duty doctrine to "liability for nondiscretionary (or 'ministerial' or 'operational') functions" and noted that at common law, a local governmental agency was immune from tort liability for acts or omissions constituting the exercise of a "discretionary" function. In its note,[9] the Court defined a "discretionary" function as "the exercise of a legislative or judicial function or the exercise of an administrative function involving the determination of fundamental governmental policy," citing *Restatement (Second) of Torts § 895C(2)(a)-(b)* (1977). The Court's note further suggests that W.Va.Code § 29–12A–5(a)(1)–(2), (4) (1986), the Local Governmental Tort Claims and Insurance Reform Act, incorporated the common-law rule granting local governments immunity with respect to "[l]egislative and quasi-legislative functions, judicial, quasi-judicial and prosecutorial functions" and the "adoption or failure to adopt a law ... rule, regulation or written policy."[10] Finally, the Court characterized the Local Governmental Tort Claims and Insurance Reform Act as an appropriate legislative reaction to the abolition by this Court of the doctrine of municipal, county, and other political subdivision governmental immunity, as reflected by *Long* and its progeny.

By drawing the distinction that the immunity provided by W.Va.Code § 29–12A–5(a)(1)–(2),(4), with respect to "[l]egislative or quasi-legislative functions," "[j]udicial, quasi-judicial or prosecutorial functions" and the "[a]doption or failure to adopt a law ... rule, regulation or written policy," incorporates the rule of common-law *immunity* while the

"immunities" granted by W.Va.Code § 29–12A–5(a)(5), relating to fire and police protection, are subject to the public duty doctrine and its exception for a "special relationship," the opinion mirrors the two legal concepts at issue in the case before us and strongly suggests that the protection afforded local governments for legislative, judicial, and administrative policy-making functions, defined by the opinion as "discretionary," differs in character and scope from the protection afforded other functions of the local governments. The obvious implication is that the former protection, grounded in the law of immunities, protects the local government entity as well as its officers, while the latter ones, grounded in the public duty doctrine, achieve a like result by way of the law of negligence, with an exception for "special relationships" which would not be available were the protection actually an immunity.

Perhaps the leading case relating to the common-law immunities available at the State level, as opposed to the local government level, is *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992). That case involved a third-party complaint against members of the State Board of Investments, in their individual capacities, for alleged negligent actions in the management of the State's investments, resulting in injury to the complainants. Complainants did not attempt to impose liability against the State Board as an entity, but attempted to impose personal liability on the members of the Board for their official actions. This Court held that:

A public executive official who is acting within the scope of his authority and is not covered by the provisions of W.Va.Code, 29–12A–1, *et seq.,* is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. To the extent that *State ex rel. Boone National Bank of Madison v.*

---

9. *See Randall,* 186 W.Va. at 346 n. 13, 412 S.E.2d at 747 n. 13.

10. *See* W.Va.Code § 29–12A–5(a)(1)–(2), (4) (1986).

*Manns,* 126 W.Va. 643, 29 S.E.2d 621 (1944), is contrary, it is overruled. *Id.* at syl. pt. 1, 424 S.E.2d 591.

*Chase* describes a "qualified immunity for executive officials, which is to be distinguished from the absolute immunity conferred on judges and legislators" and defines that immunity as an affirmative defense which must be pleaded by the official. *Chase,* 188 W.Va. at 362, 424 S.E.2d at 597. The opinion derides the distinction between "ministerial" and "discretionary" functions as arbitrary and difficult to apply and "not needed in order to apply the general qualified immunity standard" adopted in the case. *Chase,* 188 W.Va. at 364, 424 S.E.2d at 599. That standard, drawn from federal civil rights cases, was first endorsed in this State in *Bennett v. Coffman,* 178 W.Va. 500, 361 S.E.2d 465 (1987).

We also spoke to qualified or official immunity in *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995). That opinion appeared to resurrect the distinction between "discretionary" and "non-discretionary" governmental functions, although it clearly applied the *Chase* rule. The case applied qualified immunity to the actions of a conservation officer, acting within the scope of his employment, and allowed the doctrine to be applied for the benefit of the State agency which employed the officer unless the applicable insurance policy of the State waived the defense. The case cited and relied in part on *Goines v. James,* 189 W.Va. 634, 433 S.E.2d 572 (1993), which used, in a slightly altered form, the same test as *Chase* and applied the doctrine for the protection of a city police officer against *personal* liability.

Finally, we note that this Court has recently discussed judicial immunity in two cases. In *Carey v. Dostert,* 185 W.Va. 247, 406 S.E.2d 678 (1991), we held that "judges in this jurisdiction are absolutely immune from suit for the results of any judicial act performed by them while acting in their official capacity." 185 W.Va. at 253, 406 S.E.2d at 684. In that case, we said that a judge acting in his judicial capacity did not give up the protection of judicial immunity by providing the public with information contained in the public record, whether through the press or otherwise. On the other hand, in *Roush v. Hey,* 197 W.Va. 207, 475 S.E.2d 299 (1996), we held that the appearance by a judge on a nationally televised program, dedicated to contentious discussion of politically and socially sensitive issues, in order to vindicate a position expressed in a decision in a pending case is not a function normally performed by a judge. Finding that it was beyond reasonable dispute that the judge acted out of personal motivation and used his office as an offensive weapon to vindicate personal objectives, and finding that no one had invoked the judicial machinery for any purpose, this Court concluded that the judge's actions were non-judicial acts, not cloaked with judicial immunity.

With this review of cases against the backdrop of the State's constitutional immunity from suit and the legislative prescription for liability insurance relating to the State's activities and responsibilities, we seek now to achieve a reasoned statement of the current posture of common-law immunities and the public duty doctrine as it applies to case before us.

First, we reiterate that "suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Syl. pt. 2, *Pittsburgh Elevator v. W.Va. Board of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983). We require that the record in such actions reflect both the pleading of that limitation on recovery and the scope of such insurance coverage and the contractual exceptions applicable to each such case.

Second, we note that the Legislature may direct such limitation or expansion of the insurance coverages and exceptions applicable to cases brought under W.Va.Code § 29–12–5, as, in its wisdom, may be appropriate. The Legislature has also vested in the State Board of Insurance (Risk and Insurance Management) considerable latitude to fix the scope of coverage and contractual exceptions to that coverage by regulation or by negotiation of the terms of particular applicable insurance policies. In our attempt

to resolve the issues presented by this case, we are sensitive to the general rule of construction favoring liability, not immunity, in governmental tort legislation cases, cited above.[11]

Third, absent other legislative direction or express insurance contract provisions, we will apply to the issue of the State's liability in W.Va.Code § 29–12–5 cases the immunities and defenses that have been sanctioned in analogous governmental tort cases, including cases involving the immunity of local governments not entitled to the sovereign immunity of the State, with careful sensitivity to the limitations on such cases that have been judicially developed or are reasonably implied by that development.

■ Fourth, if the terms of the applicable insurance coverage and contractual exceptions thereto acquired under W.Va.Code § 29–12–5 *expressly* grant the State greater or lesser immunities or defenses than those found in the case law, the insurance contract should be applied according to its terms and the parties to any suit should have the benefit of the terms of the insurance contract.

■ Fifth, we hold that, unless the applicable insurance policy otherwise expressly provides, a State agency or instrumentality, as an entity, is immune under common-law principles from tort liability in W.Va.Code § 29–12–5 actions for acts or omissions in "the exercise of a legislative or judicial function and in the exercise of an administrative function involving the determination of fundamental governmental policy." *Restatement (Second) of Torts* § 895C(2)(a)-(b) (1977); *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 346 n. 13, 412 S.E.2d 737, 746 n. 13 (1991). We cannot conclude that the Legislature intended by its enactment of W.Va.Code § 29–12–5 to abolish this immunity, which has been described, at least as to judges and legislators,[12] as an absolute immunity.

■ We are mindful of the comments in *Chase* that the immunity provided for execu-

tive officials is a personal, qualified one "to be distinguished from the absolute immunity conferred on judges and legislators" and that such immunity is an affirmative defense which must be pleaded by the official. *Chase*, 188 W.Va. at 362, 424 S.E.2d at 597. Here, we are addressing the immunity of the State and its instrumentalities in the context of the exercise of judicial, legislative, and executive (or administrative) policy-making acts and omissions. Notwithstanding those comments in *Chase*, we conclude that the common-law immunity of the State in suits brought under the authority of W.Va.Code § 29–12–5 (1996) with respect to judicial, legislative, and executive (or administrative) policy-making acts and omissions is absolute and extends to the judicial, legislative, and executive (or administrative) officials when performing those functions.

Sixth, we recognize that the scope of "qualified immunity," as it applies to public executive officials' personal liability, or how it may extend to protect the State against suit in contexts other than legislative, judicial, or executive policy-making settings, requires more detailed analysis. In certain circumstances, the qualified immunity of public executive officials for wrongful acts or omissions within the scope of their authority should extend to protect the State governmental entity for which such officials function from liability under W.Va.Code § 29–12–5 (1996). Similarly, occasions will arise where the government should be liable when the public executive official is not, and, conversely, on occasion the State will remain free from liability under one theory or another, when the public executive official will be held liable despite qualified immunity. The comment accompanying the *Restatement (Second) of Torts 2d § 895D*, cmt. j, in part (1979), discusses the issue as follows:

> As a general rule, the immunity of a public officer is coterminous with that of his government. But this is not necessarily true. If the officer intentionally inflicts an injury or acts completely outside his authority,

---

11. *See Randall v. Fairmont City Police Department*, 186 W.Va. 336, 347, 412 S.E.2d 737, 748 (1991).

12. *See State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992); *cf.*, *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 346 n. 13, 412 S.E.2d 737, 746 n. 13 (1991).

his government is not liable in many jurisdictions. The government is normally not liable for punitive damages, even though the officer's conduct would make him liable for them. Conversely, duties or obligations may be placed on the government that are not imposed on the officer, and statutes sometime make the government liable when its employees are immune.

Beyond this, the tests for imposing liability may differ. When general tort immunity of a government has been abrogated, whether by court or legislature, this has not necessarily meant a corresponding change in the officer's liability. Even when the test is expressed in the same language, as in the availability of an immunity for the exercise of a discretionary function, its application to fact situations may prove different, depending on whether the action is brought against the government or the officer. "With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance." An officer may have a privilege so that he is not liable if he acted reasonably. To require him to be right would seriously affect his effectiveness. But the injured party sustains a real injury when the officer acted incorrectly, even though he was reasonable. It may appear just that the government should compensate for that injury.

■ We begin by endorsing the rule for the qualified immunity of public executive officials, drawn from *Chase*, from civil rights cases, and from *Bennett v. Coffman:*

A public executive official who is acting within the scope of his authority and is not covered by the provisions of W.Va.Code, 29–12A–1, *et seq.*, is entitled to qualified immunity from *personal* liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known. There is no immunity for an executive official whose acts are fraudulent, malicious, or otherwise oppressive. To the extent that *State ex rel. Boone National Bank of Madison v. Manns*, 126 W.Va. 643, 29 S.E.2d 621 (1944), is contrary, it is overruled."

Syllabus, *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992).

■ Next, we endorse the principle, expressed in the *Restatement*, that the immunity of the State is ordinarily coterminous with the qualified immunity of the public executive official whose acts or omissions give rise to an action under W.Va.Code § 29–12–5, unless the applicable insurance policy otherwise provides. We have applied that principle, albeit with mention of the discretionary nature of the officer's conduct, in *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995). Conversely, we recognize that while no qualified immunity would protect a public executive official acting beyond the scope of his authority or by fraudulent, malicious, or otherwise oppressive conduct, the vicarious liability of the State for its officer's conduct is not to be presumed merely from the absence of qualified immunity to protect the public executive official from personal liability for that conduct.[13] We suggest that the principle underlying qualified immunity provides the guideline that must be applied on a case-by-case method to determine if qualified immunity which is applicable to a public officer's actions should result in the application of that immunity to the government as well. Qualified immunity is said most often to be available to protect the public executive officer because, as suggested in *Bennett v. Coffman, Goines v. James* and *Clark v. Dunn*, an officer should not be faced with the choice of doing his duty and being constantly faced with litigation for doing so. The public inter-

---

13. In *City of Fairmont v. Hawkins*, 172 W.Va. 240, 304 S.E.2d 824 (1983), the mayor of a municipality settled a claim against the city without any formal action by the board of directors. The city finance director refused to sign the check. Hawkins signed as mayor, acting water director, and acting finance director, even though there were no such position authorized under the city charter. There was no attempt to have the check approved by the board of directors, as was required by the charter. This Court found the mayor acted in excess of his statutory authority and in violation of the command in the charter regarding the issuing of checks on the city treasury. This act was unlawful and, therefore, caused personal liability to accrue.

est is that the official conduct of the officer not be impaired by constant concern about personal liability. As the *Restatement (Second) of Torts* comment quoted suggests, this concern need not always prevent the attachment of liability to the State:

"With respect to some government functions, the threat of individual liability would have a devastating effect, while the threat of governmental liability would not significantly impair performance."

*Restatement (Second) of Torts* § 895D, cmt. j, in part (1979).

In summary, we conclude that, in cases arising under W.Va.Code § 29–12–5, and in the absence of express provisions of the insurance contract to the contrary, the immunity of the State is coterminous with the qualified immunity of a public executive official whose acts or omissions give rise to the case. However, on occasion, the State will be entitled to immunity when the official is not entitled to the same immunity; in others the official will be entitled to immunity when the State is not. The existence of the State's immunity of the State must be determined on a case-by-case basis.

Because we do not have before us a factual situation requiring further development of this approach to the scope of qualified immunity for the governmental entities represented by public officials entitled to its benefit, we leave the full development of that approach to another day.[14]

Seventh, we do not disturb our ruling in *Roush v. Hey*, 197 W.Va. 207, 475 S.E.2d 299 (1996), allowing an action to be brought where a judge's alleged actions were determined to be non-judicial acts and, therefore, were not cloaked with judicial immunity.

Eighth, we do not disturb the holding in *Higginbotham*, commented upon in *Benson*, that an action against a governmental body otherwise entitled to immunity, be it absolute or qualified, may be predicated on the violation of a "distinctive statute" which imposes a duty on the government which is owed to the claimant. As noted in the *Restatement* comment:

[D]uties or obligations may be placed on the government that are not imposed on the officer, and statutes sometime make the government liable when its employees are immune.

*Restatement (Second) of Torts* § 895D, cmt. j (1979).

Finally, we turn to the public duty doctrine and its exception for a "special relationship." Just as it was found applicable to cases against local governments in *Randall*, we hold that, the public duty doctrine and its "special relationship" exception apply to W.Va.Code § 29–12–5 actions against the State and its instrumentalities, unless the doctrine is expressly waived or altered by the terms of the applicable insurance contract. The doctrine and its exceptions are a recognized part of our law on the liability of governmental bodies, providing a means of determining the duties for whose breach such an action may be brought against such governmental bodies. "[A] governmental entity is not liable because of its failure to enforce regulatory or penal statutes." Syl. pt. 1, *Benson v. Kutsch, supra*. Likewise, we adopt the factors to be considered to determine the applicability of the "special relationship" exception, found in syllabus point 2 of *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307 (1989), and reiterate its holding in syllabus point 3: In cases arising under W.Va.Code § 29–12–5 the question of whether a special duty arises to protect an individual from a state governmental entity's negligence is ordinarily a question of fact for the trier of the facts.

Restated for their application to State agencies, the four requirements for the application of the "special relationship" ex-

---

**14.** A guideline for use in the case-by-case approach to the problem of the interplay of governmental and public officer personal tort liability, seemingly endorsed by the *Restatement (Second) of Torts*, has been well-stated in an article addressing the subject, as follows:

Unless the government's exposure to liability can genuinely be expected to impair seriously the official's performance of duty, the government should not enjoy immunity from liability simply because the official is immune.

George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Col.L.Rev. 1175, 1187 (1977).

ception to W.Va.Code § 29–12–5 cases are as follows: (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking. *See* syl. pt. 2, *Wolfe, Id.*

### THE APPLICATION OF THESE PRINCIPLES TO THIS CASE

 We turn now to the application of these principles to the case before us. First, contrary to appellant's contentions, we conclude that, in cases arising under W.Va.Code § 29–12–5, the Board of Probation and Parole, being a quasi-judicial body, is entitled to absolute immunity from tort liability for acts or omissions in the exercise of its judicial function, unless such immunity is expressly waived by the applicable insurance contract. In reaching this conclusion, we have reviewed and we now adopt the following rationale which was well stated in *Pate v. Alabama Board of Pardons and Paroles*, 409 F.Supp. 478 (1976):

> Parole officials bear a more than ordinary responsibility because of the dangerous traits already demonstrated by those with whom they must deal. This responsibility imposes far greater moral burdens and requires far more difficult legal choices than those met by the average administrative officer. The function of the Parole Board is more nearly akin to that of a judge in imposing sentence and granting or denying probation than it is to that of an executive administrator. It is essential to the proper administration of criminal justice that those who determine whether an individual shall remain incarcerated or be set free should do so without concern

over possible personal liability at law for such criminal acts as some parolee will inevitably commit; in other words, that such official should be able to exercise independent judgment without pressure of personal liability for acts of the subject of their deliberations.

*Id.* at 479.

Accordingly, we affirm the ruling of the trial court that the actions of the Parole Board appearing from the record are protected from suit under W.Va.Code § 29–12–5 by reason of quasi-judicial immunity. We are conscious of appellant's claim that certain of the actions of the Parole Board were non-judicial, facts appellant desires to develop by discovery. We also note that appellant was not permitted by the trial court to file an amended complaint. We cannot conceive of legitimate actions by the Parole Board, as a governmental entity, which are not within its quasi-judicial nature. Suffice it to say that if, upon remand, appellant can demonstrate to the trial court a basis for alleging actionable conduct by the Parole Board which was non-judicial, then the trial court can grant such opportunity as appellant's proffers and representations may justify, consistent with this opinion and the provisions of Rule 11 of the West Virginia Rules of Civil Procedure.

 We conclude next that the public duty doctrine applies to the conduct of the Parole Board and the Division of Corrections alleged in the complaint in this action. Moreover, nothing in the record discloses any special relationship between appellant and appellees when the facts alleged are measured against the test we have adopted for the application of the exception.[15] We find no allegation or evidence that either governmental entity assumed an affirmative duty to act on behalf of appellant as a person apart from the general public. While both entities may have been informed of the criminal record or tendencies of the parolee, McCrary, the complaint contains no allegation directly asserting such knowledge.

15. We have discussed appellant's claim that the Parole Board acted in a non-judicial capacity. Appellant's complaint also alleges that the appellees' officers or employees acted in bad faith and in a wanton or reckless manner but did not name such officers and employees as defendants. We, therefore, deem these claims for officers or employees acting beyond the scope of their authority not to be at issue here.

There is no allegation or evidence that appellant had direct contact with either governmental entity regarding McCrary's release, supervision, or conduct prior to the parolee's attack upon appellant nor any allegation or evidence suggesting that appellant relied on any affirmative undertaking to act on behalf of appellant. Unlike the facts in *Randall,* there is no suggestion that either governmental agency had knowledge that appellant, in particular, would be a likely victim. Accordingly, no special relationship existed between appellees, or either of them, and appellant.

There remains only the question of whether the actual provisions of such policy or policies of insurance as are said to cover the operation of the Parole Board and the Division of Corrections provide coverage notwithstanding the quasi-judicial immunity of the Parole Board and the public duty doctrine. We have made clear that the immunities and defenses available to the State and its insurer in this action are defined first by the actual provisions of the policy or policies purchased by the State and may provide coverage notwithstanding common-law immunity or the public duty doctrine. We remand to develop the record on the coverage issue thus defined and to permit appellant a reasonable opportunity to show any allegedly non-judicial conduct by the Parole Board, as a governmental entity.

If the court below finds the applicable insurance policy contemplates that the State and its insurer may assert common-law judicial immunity and may assert the public duty doctrine under the terms of the insurance policy, the court should finally dismiss the action unless appellant promptly makes an adequate showing regarding the alleged non-judicial conduct of the Parole Board. However, if the court finds that the applicable insurance policy affords coverage with respect to the claims raised here by expressly waiving either judicial immunity or the public duty doctrine, or if appellant makes the requisite showing regarding non-judicial conduct by the Parole Board, the court should allow the civil action to proceed to such result as may otherwise be proper under the law and as is contemplated under the terms of the

policy, but only to the extent the policy extends coverage. In such event, the trial court will be called upon to further determine the applicability to the State of any applicable qualified immunity that has not been waived by the insurance policy.

Accordingly, we reverse the order of the court dismissing this action and remand for further proceedings consistent with this opinion.

Reversed and remanded, with directions.