526 S.E.2d 814

**The ARNOLD AGENCY, Plaintiff Below, Appellant,**

v.

**WEST VIRGINIA LOTTERY COMMISSION, Defendant Below, Appellee.**

**No. 25405.**

Supreme Court of Appeals of West Virginia.

Submitted March 9, 1999.

Decided Dec. 13, 1999.

James B. Lees, Jr., Esq., Sharon F. Iskra, Esq., Hunt & Lees, Charleston, West Virginia, Attorneys for Appellant.

David P. Cleek, Esq., Marilyn T. McClure, Esq., Shuman, Annand, Bailey, Wyant & Earles, Charleston, West Virginia, Attorneys for Appellee.

McGRAW, Justice:

The Arnold Agency ("Arnold"), plaintiff below, appeals the circuit court's adverse grant of summary judgment with respect to its fraud and breach of contract claims against defendant/appellee West Virginia Lottery Commission (the "Lottery Commission" or "Commission"). Arnold's claims are predicated upon the Lottery Commission's alleged failure to award it a $2.8 million advertising and public relations contract.

Arnold contends on appeal that the circuit court erred in (1) determining that the Lottery Commission is an agency of the State and cloaked in sovereign immunity under Article VI, § 35 of the West Virginia Constitution; (2) dismissing its fraud count; (3) permitting the Lottery Commission to assert the absence of insurance coverage after the deadline for filing dispositive motions; (4) concluding that the State's liability insurance policy does not provide coverage with respect to Arnold's breach of contract claim; and (5) granting a protective order prohibiting Arnold from deposing then-Governor Gaston Caperton. While we conclude that the Lottery Commission is immune from suit and that Arnold's fraud claim is therefore barred, we determine that the State's liability insurance potentially provides coverage for the breach of contract claim, thus permitting the present case to proceed to trial.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Arnold filed a two-count complaint on November 30, 1993, alleging breach of contract and fraud in connection with the bidding of the Lottery Commission's fiscal year 1991–92 advertising contract.[1] It is uncontested that the advertising contract was subject to competitive bidding, and that an evaluation committee was formed within the Commission for the purpose of evaluating competing bids. Arnold alleges that employees of the Commission represented that the evaluation

---

1. The facts of this case were previously touched upon by this Court in *State ex rel. Fahlgren Mar-* *tin, Inc. v. McGraw,* 190 W.Va. 306, 438 S.E.2d 338 (1993).

committee would assign numerical scores to each bid, and that the contract would be awarded to the advertising agency receiving the highest score. Arnold was one of six agencies that bid on the contract in April 1991, and claims that it received the highest numerical score given by the evaluation committee. However, the contract in question was subsequently awarded to one of Arnold's competitors, Fahlgren Martin, Inc. ("Fahlgren Martin"). Count one of Arnold's complaint asserts that as a consequence of these facts, the Lottery Commission breached an agreement pertaining to the bidding of the contract. Among other relief, Arnold seeks expectancy damages in the form of its lost profits.

In the second count of its complaint, Arnold further alleges that the Lottery Commission fraudulently induced it to compete in the bidding process. It claims that the Commission's director, Elton "Butch" Bryan ("Bryan"), orchestrated a fraudulent scheme to ensure that Fahlgren Martin would be awarded the advertising contract notwithstanding the results of the formal evaluation process.[2] Specifically, Arnold alleges that upon Bryan's instructions, the Commission's deputy director for marketing, Tamara Gunnoe, falsely informed the members of the Commission that Fahlgren Martin had been chosen by the evaluation committee to receive the contract. Also, it claims that both Bryan and Gunnoe purposely misled the State's purchasing department by making false representations and providing a falsified memorandum regarding the evaluation committee's employment of a numerical scoring system in purportedly selecting Fahlgren Martin for the contract.

After Arnold filed its initial complaint, the Lottery Commission moved to dismiss on the ground that the circuit court lacked subject matter jurisdiction based upon the Commission's constitutional immunity. Arnold had previously submitted interrogatories to the Commission, which among other things requested information regarding whether there was insurance coverage for the conduct alleged in the complaint. After having received no response to these interrogatories, Arnold filed a motion to compel discovery on February 18, 1994. Shortly thereafter, Arnold also amended its complaint to seek damages under and up to the limits of the State's liability insurance coverage. Both the motion to dismiss and the motion to compel were the subjects of a March 24, 1994 hearing, after which the circuit court stayed all pending discovery pending a decision on the Commission's dismissal motion.

Another hearing on the Commission's motion to dismiss was conducted on September 22, 1994.[3] The circuit court subsequently issued an order on October 27, 1994, ruling that while the Lottery Commission was a state agency and thus protected by sovereign immunity, Arnold could nevertheless proceed with its suit under *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), to the extent that the State's insurance policy provides coverage for the conduct alleged. The circuit court also ordered that all outstanding discovery be answered within thirty days. While depositions and other discovery were subsequently taken,[4] the Commission apparently failed to answer Arnold's interrogatories concerning the existence of insurance coverage.

The Lottery Commission subsequently moved for summary judgment on October 16,

---

**2.** Bryan was subsequently convicted of mail fraud in federal district court in connection with this matter, which was affirmed in *United States v. Bryan*, 58 F.3d 933 (4th Cir.1995).

**3.** By the time of this second hearing, the original presiding judge, the Honorable John Hey, had departed the bench. All subsequent proceedings were before the Honorable Irene C. Berger.

**4.** Following the circuit court's entry of a dismissal order in this case, and after it had filed its petition for appeal in this case, Arnold filed numerous deposition transcripts with this Court.

However, Arnold has not moved to supplement the record with these materials pursuant to W. Va. R.App. P. 17; nor does it appear that this evidence was ever put before the circuit court. Consequently, we do not consider it on appeal. *See West Virginia Dep't of Health and Human Resources v. Doris S.*, 197 W.Va. 489, 493–94 n. 6, 475 S.E.2d 865, 869–70 n. 6 (1996) ("evidence not submitted before the trial court may not be considered by this Court on appeal") (citing *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.*, 196 W.Va. 692, 703 n. 6, 474 S.E.2d 872, 883 n. 6 (1996)).

1995, asserting that (1) it was not liable for the fraudulent, illegal or unauthorized acts of its officers, agents, or employees; and (2) that Arnold's breach of contract claim was barred by constitutional immunity. This motion was later supplemented to include an assertion that the statute of frauds bars the present action. Following a hearing on August 5, 1996, the circuit court issued an order on August 21, 1996, dismissing Arnold's fraud claim on the basis that "fraud may not be maintained against a state governmental agency for the acts of its agents as estoppel for such acts does not apply to the State." While the court refused to dismiss Arnold's breach of contract claim—rejecting the Commission's statute of frauds argument—it expressly noted that "the issue of whether insurance coverage is present is not properly before this court and therefore was not considered in the rulings rendered herein...." Consequently, the crucial issue of whether the circuit court had subject matter jurisdiction over the breach of contract claims was yet unresolved at this time.

Trial was set for November 18, 1996. Before this date, however, the Lottery Commission presented another motion for summary judgment on October 29, 1996, this time contending that the State's insurance policy does not provide coverage for Arnold's breach of contract claim. The Commission also at this point proffered a copy of the applicable policy. On the date of trial, counsel for the Lottery Commission reiterated its position on the issue of insurance coverage, and, following argument on this issue, the circuit court granted the Commission's motion for summary judgment. The circuit court subsequently issued an order dismissing Arnold's suit on March 11, 1998, ruling that "no insurance coverage exists under the applicable insurance policy for the acts complained of ... by the plaintiff throughout these proceedings...."[5] The court later entered a more comprehensive "Final Order" on May

6, 1998, which supplied a detailed rationale for the court's conclusion regarding the absence of insurance coverage.

## II.

## DISCUSSION

### A.

### *Status of the Commission as an Arm of the State*

■ Article VI, § 35 of the West Virginia Constitution peremptorily requires that "[t]he State of West Virginia shall never be made defendant in any court of law or equity. ..." We have consistently held that this "grant of immunity is absolute and ... cannot be waived by the legislature or any other instrumentality of the State." *Mellon–Stuart Co. v. Hall,* 178 W.Va. 291, 296, 359 S.E.2d 124, 129 (1987); *see also Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374, 378 (1995). "[T]he policy which underlies sovereign immunity is to prevent the diversion of State monies from legislatively appropriated purposes. Thus, where monetary relief is sought against the State treasury for which a proper legislative appropriation has not been made, sovereign immunity raises a bar to suit." *Mellon–Stuart,* 178 W.Va. at 296, 359 S.E.2d at 129 (citations and footnote omitted).

In this case, Arnold argues that the Lottery Commission is not a state agency, and therefore may not seek refuge under the cloak of constitutional immunity. The primary justification for this position is that the Commission is financially self-sustaining, and is engage in a proprietary activity intended solely to generate revenue for the State.

As a practical consequence of the expansion of government and the proliferation of bodies charged with conducting the State's business, we have recognized that "proceed-

---

**5.** Prior to the circuit court's entry of the dismissal order, Arnold twice moved for the court to reconsider its earlier bench ruling. In the course of seeking to persuade the court to reverse itself on the issue of insurance coverage, Arnold submitted the deposition testimony of Robert Fisher, who had previously been the claims adjuster assigned to this matter by the State's insurance carrier. It also deposed James Boone, a former claims manager with the West Virginia Board of Risk Management. The circuit court declined to give this evidence any weight, stating in its final order of May 6, 1998 that interpretation of the insurance policy in this case was purely a question of law. We concur with the circuit court's assessment.

ings against boards and commissions, created by the Legislature, as agencies of the State, are suits against the state within the meaning of Article VI, Section 35, of the Constitution of West Virginia, even though the State is not named as a party in such proceedings." *Hamill v. Koontz,* 134 W.Va. 439, 443, 59 S.E.2d 879, 882 (1950); *see also Hesse v. State Soil Conservation Committee,* 153 W.Va. 111, 115, 168 S.E.2d 293, 295 (1969) (constitutional immunity "relates not only to the State of West Virginia but extends to an agency of the state to which it has delegated performance of certain of its duties").

■ However, not every entity created by the Legislature is entitled to the protection of constitutional immunity. In *Ohio Valley Contractors v. Board of Educ. of Wetzel County,* 170 W.Va. 240, 241, 293 S.E.2d 437, 438 (1982), we synthesized our past cases and created a five-factor test to determine whether an organization is an agency of the State:

> Factors to consider are [1] whether the body functions statewide ...; [2] whether it does the State's work ...; [3] whether it was created by an act of the Legislature ...; [4] whether it is subject to local control ...; and [5] its financial dependence on State coffers....

170 W.Va. at 241, 293 S.E.2d at 438 (citations omitted). The Court later went on to stress, in an analogous context, the importance of examining an organization's legislative framework, giving particular attention to whether

its powers are substantially created by the legislature, and whether its governing board's composition is prescribed by the legislature. Other significant factors are whether the organization can operate on a statewide basis, whether it is financially dependent on public funds, and whether it is required to deposit its funds in the state treasury.

Syl. pt. 1, in part, *Blower v. West Virginia Educ. Broad. Auth.,* 182 W.Va. 528, 389 S.E.2d 739 (1990). "In determining whether a commission or other body or entity created by the state is in truth and effect a part of the state, all of the features or characteristics must be considered and consequently each case must rest upon the provisions of the entity's own creation." *Hope Natural Gas Co. v. West Virginia Turnpike Comm'n,* 143 W.Va. 913, 928, 105 S.E.2d 630, 639 (1958).

■ Because this issue results from the circuit court's ruling on summary judgment, and because it raises issues of law concerning constitutional immunity, our review is *de novo.* Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo.*"); *Gribben v. Kirk,* 195 W.Va. 488, 493, 466 S.E.2d 147, 152 (1995) ("appellate courts review questions involving principles of sovereign immunity *de novo*") (citation omitted).

■ Our analysis need go no further than the clear language of Article VI, § 36 of the West Virginia Constitution.[6] We have previously indicated that while the Legislature may not expressly abrogate constitutional immunity, legislative statements regarding

---

**6.** Article VI, § 36 provides in full:

The legislature shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State; except that the legislature may authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more other states and may authorize state-regulated bingo games and raffles for the purpose of raising money by charitable or public service organizations or by the State Fair of West Virginia for charitable or public service purposes: Provided, that each county may disapprove the holding of bingo games and raffles within that county at a regu-

lar, primary or special election but once having disapproved such activity, may thereafter authorize the holding of bingo games and raffles, by majority vote at a regular, primary or special election held not sooner than five years after the election resulting in disapproval; that all proceeds from the bingo games and raffles be used for the purpose of supporting charitable or public service purposes; and that the legislature shall provide a means of regulating the bingo games and raffles so as to ensure that only charitable or public service purposes are served by the conducting of the bingo games and raffles.

Prior to the ratification of an amendment to Article VI, § 36 on November 6, 1984, the Legislature was expressly prohibited from authorizing lotteries in any form.

whether an entity is intended to be independent of the State may nevertheless be considered. *See Ohio Valley Contractors*, 170 W.Va. at 242, 293 S.E.2d at 439. Constitutional pronouncements regarding the intended status of a particular agency are obviously of great if not overriding significance.

Article VI, § 36 expressly prohibits the creation of lotteries within our state, with the exception that "the legislature may authorize lotteries which are *regulated, controlled, owned and operated by the State of West Virginia* in the manner provided by general law...." (Emphasis added.) The Lottery Commission was created by the Legislature under such authority. *See* State Lottery Act, 1985 W. Va. Acts ch. 115 (codified as amended at W. Va.Code §§ 29–22–1 to –28). As we stated in Syllabus point 1, in part, of *State ex rel. Mountaineer Park v. Polan*, 190 W.Va. 276, 438 S.E.2d 308 (1993), "[o]nly those lottery operations which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general laws enacted by the West Virginia Legislature. may be properly conducted in accordance with the exception created under article VI, section 36 of our Constitution."

█ The constitutional requirement of Article VI, § 36, which firmly requires that any lottery be under the aegis of the State, is determinative in the present case. As a consequence, we hold that the Lottery Commission is an agency of the State, and is entitled to assert constitutional immunity under W. Va. Const. art. VI, § 35.

### B.

### *The Commission's Delay in Proffering the Insurance Contract*

█ Arnold further contends that the circuit court abused its discretion in failing to enforce its scheduling order when it permitted the Lottery Commission to first raise the issue of insurance coverage after an October 15, 1995 deadline for filing dispositive motions. Specifically, it points to the fact that the Commission did not move for summary judgment based upon the absence of insurance until October 29, 1996. Arnold also asserts that the Lottery Commission failed to provide it with a copy of the applicable policy of insurance prior to that date, notwithstanding the fact that this information was requested by interrogatory in November 1993, and the circuit court had earlier granted a motion to compel such discovery in its October 27, 1994 order.

The Lottery Commission responds by noting it has asserted constitutional immunity as a jurisdictional bar since the inception of this litigation, and that West Virginia's unique law governing such immunity put counsel in the "precarious position" of having to assert that the Commission's insurance policy did not provide coverage. In the latter context, it points out that the circuit court's ruling predates our decision in *Parkulo v. West Virginia Bd. of Probation and Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1997), where we directed that when a plaintiff pursues recovery under an agency's liability insurance policy,[7] "the text of the applicable insurance coverages afforded, including any applicable contractual exceptions or limitations contained in the policies, should be included in the record at an early stage of the proceedings so that the trial court can readily determine whether, and to what extent, claims and causes of action pleaded are made subject to litigation in the courts by reason of W. Va. Code § 29–12–5 and the applicable insurance policy or policies." *Parkulo*, 199 W.Va. at 169–70, 483 S.E.2d at 515–16. The Commission further explains that the failure to provide timely information regarding insurance coverage was an unintentional oversight, occasioned, in part, by a grievous event in counsel's personal life.

█ A trial court's procedural rulings are afforded substantial deference on appeal. As we stated in Syllabus point 1 of *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995):

The West Virginia Rules of Evidence and the West Virginia Rules of Civil Proce-

---

**7.** *See* Syl. pt. 2, *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983) (holding that suits which seek recovery under and up to the limits of the State's liability insurance coverage are not barred by sovereign immunity).

dure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

"The imposition of sanctions by a circuit court under W. Va. R. Civ. P. 37(b) for the failure of a party to obey the court's order to provide or permit discovery is within the sound discretion of the court and will not be disturbed upon appeal unless there has been an abuse of that discretion." Syl. pt. 1, *Bell v. Inland Mut. Ins. Co.,* 175 W.Va. 165, 332 S.E.2d 127, *cert. denied sub nom., Camden Fire Ins. Ass'n v. Justice,* 474 U.S. 936, 106 S.Ct. 299, 88 L.Ed.2d 277 (1985).

 Although the Court is troubled by the fact that counsel for the Lottery Commission failed to provide the sought-after discovery concerning insurance coverage for such a long period of time, we do not find that the circuit court abused its discretion in permitting the Commission to bring forward the issue of insurance coverage. We take this opportunity, however, to stress the importance of the procedural path set in *Parkulo,* and to admonish that when constitutional immunity is raised as a jurisdictional defense, the parties (and particularly a defendant governmental agency) have an affirmative obligation to promptly tender copies of applicable liability insurance policies so that the trial court may make a timely determination as to the existence of insurance coverage.

8. Arnold also presents a separate assignment of error challenging the circuit court's dismissal of its fraud claim. Specifically, it takes issue with the court's conclusion in its August 21, 1996 order that "a cause of action for fraud may not be maintained against a state governmental agency for the acts of its agents as estoppel for such acts does not apply to the State." Arnold attempts to support its fraud claim by pointing to language in *Samsell v. State Line Dev. Co.,* 154 W.Va. 48, 174 S.E.2d 318 (1970), where in dicta we recognized the existence of legal support for the assertion that estoppel may apply to the state "when acting in a proprietary capacity, as distinguished from a governmental capacity." *Id.* at

**C.**

*Insurance Coverage*

As a tertiary argument, Arnold asserts that its claim for breach of contract is covered under a policy of insurance procured on behalf of the Lottery Commission by the State Board of Risk and Insurance Management pursuant to W. Va.Code § 29–12–5.[8] Specifically, it maintains that both the Comprehensive General Liability ("GSL") and Wrongful Acts Liability ("WAL") sections of the policy provide the jurisdictionally-required coverage.

 Although facially absolute, this Court has carved a narrow exception to constitutional immunity where a plaintiff merely seeks recovery under the State's liability insurance coverage. In Syllabus point 2 of *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983), we explained that "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." The Court subsequently noted in Syllabus point 1 of *Eggleston v. West Virginia Dept. of Highways,* 189 W.Va. 230, 429 S.E.2d 636 (1993):

W. Va.Code, 29–12–5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer

59–60, 174 S.E.2d at 326. The issue that Arnold raises in this regard, however, begs the more immediate jurisdictional question of whether our law of immunities permits a claim for money damages against the State premised on fraud. In light of our determination that the Lottery Commission is an agency of the State, constitutional immunity bars such a claim in the absence of insurance coverage. *See Pittsburgh Elevator Co. v. West Virginia Bd. of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983). Arnold has at no point in these proceedings identified or substantiated the existence of such coverage with respect to its assertion of fraud; consequently, the fraud claim is barred by constitutional immunity.

shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits."

We undertake review of the relevant contract language in order to determine whether *Pittsburgh Elevator* permits recovery in the present case.

 **1. Comprehensive General Liability Coverage.** As with any written contract, our initial task in interpreting the provisions of an insurance policy is to determine whether the language of the instrument is so unequivocal as to leave no doubt concerning the meaning intended by the parties. Thus, "[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syllabus, *Keffer v. Prudential Ins. Co.*, 153 W.Va. 813, 172 S.E.2d 714 (1970); *see also* Syl. pt. 2, *Louk v. Isuzu Motors, Inc.*, 198 W.Va. 250, 479 S.E.2d 911 (1996); Syl. pt. 1, *Russell v. State Auto. Mut. Ins. Co.*, 188 W.Va. 81, 422 S.E.2d 803 (1992).

The CGL section of the State's liability insurance policy provides, in pertinent part, that

[t]he Company will pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of *Bodily Injury* and *Property Damage* to which this insurance applies, caused by an Occurrence....

(Emphasis added.)[9] The exclusions portion of the CGL section states, *inter alia*, that such coverage does not apply "to liability

assumed by the Insured under any contract or agreement except an Incidental Contract...." An endorsement to the CGL section defines an "Incidental Contract" as "any written contract or agreement relating to the conduct of the Named Insured's business."[10]

Arnold emphasizes the fact that the circuit court, in its final order of May 6, 1998, concluded that the advertising contract at issue was an incidental contract as defined by the policy. As the Lottery Commission points out, however, this fact is unavailing since the coverage provided by the CGL section extends only to claims of bodily injury and property damage. Arnold has never alleged such damages. Consequently, under the clear language of the CGL section of State's insurance policy, there is no coverage for the breach of contract claim.

 **2. Wrongful Acts Liability Coverage.** Arnold also argues that its breach of contract claim is potentially covered by the WAL section of the State's liability insurance policy. The WAL section of the policy provides coverage for, among other things, losses occasioned by "Wrongful Acts" committed by the Lottery Commission and its employees. The policy defines "Wrongful Acts" as

any actual or alleged error or misstatement or act or omission or neglect or breach of duty including malfeasance, misfeasance, and nonfeasance by the Insureds in the discharge of their duties to the "Named Insured," individually or collectively, or any matter claimed against them solely by reason of their being or having been Insureds.[11]

9. The policy defines "Bodily Injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." The term "Property Damage" is defined to mean "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an Occurrence during the policy period." "Occurrence" is correspondingly defined as "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured."

10. The parties apparently do not contest the circuit court's tacit conclusion that this definition of incidental contract was intended to supersede that set forth in the more general definitions section of the policy.

11. The "Named Insured" under the policy is, collectively, the State of West Virginia and the Lottery Commission, while an "Insured" is "the 'Named Insured' and those persons who were, are now or shall be duly elected or appointed officials or members or employees of the 'Named Insured.'"

(Footnote added.) An exception to this coverage provides:

The Company shall not be liable to make any payment in connection with any claim made against the Insureds:

. . . .

3. Brought about or contributed to by fraud or dishonesty of any Insured; however, notwithstanding the foregoing, the Insureds shall be protected under the terms of this coverage part as to any claims upon which suit may be brought against them by reason of any alleged fraud or dishonesty on the part of any Insureds, unless a judgement or other final adjudication thereof adverse to such Insureds shall establish that acts of active or deliberate dishonesty or fraud committed by such Insureds were material to the cause of action so adjudicated.

. . . .

The clear language of the policy prohibits application of the exclusion except where there has been a formal adjudication of material fraud on the part of the Lottery Commission, or its officers or employees.

The Lottery Commission apparently does not contest the circuit court's conclusion that, absent application of this exclusion for acts involving fraud or dishonesty, Arnold's claim for breach of contract would be covered under the policy.[12] Consequently, our focus is on whether the circuit court properly applied the exclusion to bar coverage.[13] Arnold asserts that there was no evidentiary or other basis upon which to adjudicate the existence of fraud relative to the Lottery Commission's alleged breach of contract.

The Lottery Commission argues in reply that the circuit court's conclusion with respect to WAL coverage is supported by the allegations of fraud contained in Arnold's amended complaint. We find no merit in this assertion. Under W. Va. R. Civ. P. 8(e)(2):

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds or on both. All statements shall be made subject to the obligations set forth in Rule 11.

This rule gives parties considerable latitude in framing their pleadings,[14] and expressly permits claims or defenses to be pled alternatively or hypothetically regardless of consistency.

A party is normally permitted to make inconsistent factual allegations in its pleadings. *See generally* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1283, at 533 (2d ed.1990). As the Ninth Circuit stated: "Clearly, a policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by Rule 8(e)(2)." *Molsbergen v. United States,* 757 F.2d 1016, 1018–19 (9th Cir.), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). Thus, a

12. The Lottery Commission does point out, however, that the definition of "loss" contained in the WAL section of the policy specifically excludes "any amount due or payable under the *terms* of any contractual obligation." (Emphasis added.) Arnold is therefore precluded from obtaining expectancy damages in connection with its claim of breach of contract.

13. In ruling that the fraud exclusion applied, the circuit court stated in its final order of May 6, 1998 that

pursuant to this Court's interpretation and understanding of the claims made by the plaintiff in its case since the inception of this lawsuit through a review of the file and the argument on various issues before this Court, the action of "Butch" Elton Bryan and others were factual predicates to this claim [of breach of contract] and bring into play this exclusion of [the] wrongful act liability [insurance] policy.

14. This flexibility is manifest in other rules, such as W. Va. R. Civ. P. 15(b), which provides in part that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

596

factual assertion pertaining to one claim set forth in a pleading will not be construed as an admission with respect to an alternative or inconsistent claim in the same pleading. *See Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir.1994); *Molsbergen*, 757 F.2d at 1019 ("In light of the liberal pleading policy embodied in Rule 8(e)(2), ... a pleading should not be construed as an admission against another alternative or inconsistent pleading....").

Our review of Arnold's amended complaint indicates that count two, which sets forth a cause of action grounded in fraud, is pled in the hypothetical—*i.e.*, it was pled based upon additional alleged facts pertaining exclusively to the claim of fraud. Significantly, the allegations of fraudulent conduct are predicated upon information and belief, and none of the essential facts upon which Arnold predicates its claim are asserted to be within the personal knowledge of any of its principals or employees. The allegation "can't sensibly be called an 'admission'; it is a characterization of (or perhaps just a speculation about) what evidence unknown to the pleader may show." *Moriarty v. Larry G. Lewis Funeral Dir. Ltd.*, 150 F.3d 773, 778 (7th Cir.1998). Arnold is therefore not bound by the factual allegations contained in its fraud count, and the two counts of the amended complaint should have been examined independently. Put in words relevant to the issue of whether coverage is afforded by the WAL section of the State's insurance policy, the allegations of Arnold's fraud claim do not provide an evidentiary basis upon which to adjudicate the issue of whether fraud or dishonesty materially contributed to the alleged breach of contract. Consequently, the circuit court's reliance upon Arnold's allegations of fraud was error.

■ The Lottery Commission also contends that the circuit court "implicitly took judicial notice" of the fact that its director, Elton "Butch" Bryan, was convicted in federal court of (among other things) mail fraud under 18 U.S.C. §§ 1341, 1346 (1994). In proceedings below, the Lottery Commission submitted copies of the indictment and final judgment pertaining to this criminal conviction.

■ It was certainly within the circuit court's prerogative to use these records for the purpose of ascertaining that Bryan had, in fact, been convicted of mail fraud. Under W. Va. R. Evid. 201, a court is permitted to take judicial notice of adjudicative facts that cannot reasonably be questioned in light of information provided by a party litigant. However, while a court may take judicial notice of the orders of another court, such notice is " 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992) (citation omitted). *See also United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994) ("a court may take judicial notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation"). As one treatise explains, "[i]f it were possible for a court to take judicial notice of a fact because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." 21 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5106, at 247 (2d ed. Supp.1999).

■ Where the circuit court also erred in this case, was in using these records to effectively find that the Lottery Commission was collaterally estopped on the issue of fraud, based upon Bryan's criminal conviction. In Syllabus point 1 of *Haba v. The Big Arm Bar and Grill, Inc.*, 196 W.Va. 129, 468 S.E.2d 915 (1996), we stated:

"'Collateral estoppel [or issue preclusion] will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.' Syllabus Point 1, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995)."

Putting aside the more difficult and complex question of whether the Lottery Commission, (as a nonparty to the earlier criminal proceeding) can be deemed to be in privity with Bryan, it is clear that the issue adjudicated in federal criminal proceedings is not identical to the issue of fraud raised in the present case. For collateral estoppel or issue preclusion to attach under these circumstances, a clear showing must be made that common issues were in fact resolved by the criminal judgment.

Under the federal mail-fraud statute, 18 U.S.C. § 1341,[15] the government is not required to prove that someone was actually defrauded or, suffered loss; rather, it is sufficient to prove that the defendant knowingly devised a scheme to defraud, and used the mails in furtherance of such scheme. *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990) ("the scope of fraud under these statutes is broader than common law fraud, and that no misrepresentation of fact is required in order to establish a scheme to defraud"); *United States v. King*, 860 F.2d 54, 55 (2d Cir.1988) ("[T]he validity of a mail fraud conviction does not hinge upon a showing of actual loss by the intended victim.... It is enough that [defendant] knowingly devised a scheme to defraud and caused the use of the mails in furtherance of the scheme."). Thus, because Bryan's mail-fraud conviction did not involve adjudication of the issue of whether Bryan's deceptive conduct was material to the alleged breach of contract, it has no preclusive effect in current proceedings. We therefore reverse the circuit court with respect to its ruling on the existence of insurance coverage for Arnold's breach of contract claim.[16]

## D.

### *Deposition of Former Governor Caperton*

■ Lastly, Arnold asserts error in connection with the circuit court's refusal to permit it to depose then-Governor Gaston Caperton. The Lottery Commission counters by arguing that this issue is not ripe for judicial review because the circuit court's refusal to permit the deposition of Governor Caperton was "provisional" in that it directed Arnold to renew its discovery request if it was unable to obtain the necessary information by other, less intrusive means.

---

**15.** Section 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not, more than $1,000,000 or imprisoned not more than 30 years, or both.

**16.** The Lottery Commission raises a cross-assignment of error under W. Va. R.App. P. 10(f), arguing that the circuit court erred in concluding in its October 27, 1994 order that the actions of Director Bryan and the Commission's deputy director, Tamara Gunnoe, were not ultra vires. The court stated in its order: "The director of the Commission is cloaked with the apparent authority to, manage and/or supervise the bid process for obtaining advertising agreements and, therefore[,] the acts of the director and the deputy director alleged in the complaint are not 'ultra vires' acts." West Virginia Code § 29–22–6(13) empowers the Lottery Commission to "make and enter into all agreements and do all acts necessary or incidental to the performance of its duties and the exercise of its powers under this article." To the extent the circuit court merely concluded that, in the absence of evidence proving otherwise, Bryan and Gunnoe were acting within the scope of their authority in connection with the awarding of the contract in question, we see no reason to disturb the court's ruling. As Arnold properly states in its reply brief, "[t]he fact that [the Lottery Commission] did not award the contract to the proper party as per the agreement [regarding competitive bidding] ... does not make the act of awarding the contract an ultra vires act."

After Arnold gave notice of a deposition scheduled for May 22, 1995, Governor Caperton moved for a protective order under W. Va. R. Civ. P. 26(c) to prohibit the taking of his deposition, asserting, *inter alia,* that Arnold had failed to demonstrate either the relevance or necessity of his testimony. Arnold responded by presenting evidence indicating that (1) Governor Caperton had previously promised one of the principals of Fahlgren Martin that state advertising contracts would be forthcoming in exchange for campaign support; and (2) the Governor had in fact exerted influence or control over Director Bryan's conduct in awarding the contact in question to Fahlgren Martin.[17] The circuit court subsequently granted the Governor's motion by an order entered May 26, 1995.[18]

 Although the circuit court's ruling on this issue predated our decision in *State ex rel. Paige v. Canady,* 197 W.Va. 154, 475 S.E.2d 154 (1996), it applied a substantially equivalent standard. We held in Syllabus point 3 of *Paige:* "Highly placed public officials are not subject to a deposition absent a showing that the testimony of the official is necessary to prevent injustice to the party requesting it." The Court went on to expound the following balancing test:

When determining whether to allow the deposition of a highly placed public official, the trial court should weigh the necessity to depose or examine an executive official against, among other factors, (1) the substantiality of the case in which the deposition is requested; (2) the degree to which the witness has first-hand knowledge or direct involvement; (3) the probable length of the deposition and the effect on government business if the official must attend the deposition; and (4) whether less onerous discovery procedures provide the information sought.

*Paige,* Syl. pt. 4. "The burden is upon the proponent of the deposition to show the necessity of taking an oral deposition of a highly-placed government official." *Id.,* Syl. pt. 5.

The posture of this issue has changed significantly since the circuit court made its initial ruling: Governor Caperton is no longer a high-ranking state official. The Court must therefore determine whether the issue that Arnold raises is now moot based upon the Governor Caperton's current status as private citizen. *See* Syl. pt. 1, *Swartz v. Public Serv. Comm'n,* 136 W.Va. 782, 68 S.E.2d 493 (1952) (" 'Moot questions or abstract propositions, the decision of which would avail nothing in the determination of

17. Evidence of the Governor's involvement in steering the contract to Fahlgren Martin was based upon hearsay testimony. *Cf.* W. Va. R. Evid. 104(a) (court not bound by rules of evidence in deciding preliminary questions concerning existence of privilege). A principal of the appellant, Linda Arnold, related a statement made by the Governor's former wife, Dee Caperton, which indicated that a meeting occurred between Governor Caperton, Dee Caperton, and Smoot Fahlgren (a principal of Fahlgren Martin) in the parking lot of the Greenbrier Hotel, at which an understanding was reached "[t]hat if Smoot Fahlgren would support Gaston Caperton [for governor] and raise money for him, then it would be worth his while in terms of the State business going to his agency." The record does not indicate whether Arnold attempted to depose any of the other participants in the alleged meeting.

The deputy director of the Lottery Commission, Tamara Gunnoe, also testified that after it was determined that Arnold had received the highest numerical score in the bidding process, she was told by Director Bryan "that he had met with the governor and we were going to have to give the contract to [Fahlgren Martin]." At-

tempts to depose Bryan apparently resulted in his assertion of the Fifth Amendment privilege against self-incrimination.

18. The circuit court gave the following rationale for its ruling:

1) Plaintiff has failed to meet its burden of proving both the factual and legal necessity and relevance of deposing Governor Caperton; 2) the Court is not satisfied that Governor Caperton's deposition is necessary or relevant to defeat any affirmative defenses asserted by or on behalf of the Defendant; 3) Plaintiff has not exhausted all of the less intrusive methods and means available to secure testimony regarding the issue on which Plaintiff seeks to depose Governor Caperton; and 4) granting the motion works no prejudice to Plaintiff because no scheduling order has yet been entered and the Court has granted leave to the Plaintiff to renew its Notice of Deposition of Governor Caperton at a later date if Plaintiff has otherwise exhausted all available options for securing the information and the Court is convinced of the factual and legal necessity and relevance of said discovery.

controverted rights of persons or of property, are not properly cognizable by a court.' *State ex rel. Lilly v. Carter,* 63 W.Va. 684, point 1, Syllabus, 60 S.E. 873 [ (1908) ].").

We have found only one case that specifically addresses the issue of whether a former high-ranking government official may assert his or her previous position as a basis for avoiding an oral deposition. In *Sanstrom v. Rosa,* 1996 WL 469589 (S.D.N.Y. Aug.16, 1996), the former governor of New York, Mario Cuomo, attempted to avoid deposition, asserting that his former status as a high-ranking official shielded him from such discovery. The district court rejected this argument, stating that "because Mr. Cuomo is no longer governor, he cannot claim this privilege." *Id.* at *5 (citation omitted). The stance taken by the court in *Sanstrom* is in accord with the primary purpose of the rule disfavoring oral deposition of senior officials, which is to endow such officers with "the freedom to perform their tasks without the constant interference of the discovery process." *Warzon v. Drew,* 155 F.R.D. 183, 185 (E.D.Wis.1994) (citing, *inter alia, In re United States,* 985 F.2d 510, 512 (11th Cir.), *cert. denied sub nom. Faloon v. United States,* 510 U.S. 989, 114 S.Ct. 545, 126 L.Ed.2d 447 (1993)). "If the head of a government agency were subject to having his [or her] deposition taken concerning any litigation affecting [the] agency ..., we would find that the heads of governmental departments and members of the President's cabinet would be spending their time giving depositions and would have no opportunity to perform their functions." *Capitol Vending Co. v. Baker,* 36 F.R.D. 45, 46 (D.D.C.1964).

While we discern a marked difference between current and former government officials in terms of the likely frequency and onerousness of discovery requests, we see no reason to discard entirely the analytical framework outlined in *Paige.* Former high-ranking government administrators, whose past official conduct may potentially implicate them in a significant number of related legal actions, have a legitimate interest in avoiding unnecessary entanglements in civil litigation. That interest obviously survives leaving office. Thus, we hold that the standard enunciated in *Paige* continues to apply in instances where a party seeks to orally depose a former high-ranking government official pursuant to W. Va. R. Civ. P. 30. Given the continued applicability of this standard, the present issue is not rendered moot.

The unfolding of the crucial issue regarding whether the alleged breach of contract was a consequence of fraud leaves no question but that evidence demonstrating Governor Caperton's involvement in such a scheme would be highly relevant to a determination of whether Arnold has a jurisdictional basis for recovery. The fact remains, however, that the circuit court specifically directed Arnold to resort to less intrusive means of obtaining the sought-after initial discovery.

In *Paige,* the Court stressed that the deposition proponents in that case had "failed to show that they could not obtain the information they seek through less onerous discovery procedures, such as written interrogatories." 197 W.Va. at 162, 475 S.E.2d at 162. The United States District Court for the District of Columbia recently made a similar observation, noting that "the submission of interrogatories by the plaintiffs is the appropriate manner in which to initially proceed to determine whether these [high-ranking government officials] have *any* [relevant] knowledge...." *Alexander v. FBI,* 186 F.R.D. 1, 5 (D.D.C.1998) (citations omitted, emphasis in original). Because of the availability of less burdensome means of initial discovery in the present case, we see no reason to conclude that the circuit court abused its discretion in entering the protective order.[19]

---

19. On remand, Arnold (or the Lottery Commission, if it chooses) should be permitted—based upon evidence previously adduced indicating that the Governor played a unique and material role in the matters at issue in this case—to take the testimony of former-Governor Caperton upon written questions pursuant to W. Va. R. Civ. P. 31. Such deposition on written questions may seek information relevant to determining the existence of fraud in the award of the Commission's advertising contract. If probative evidence emerges from such discovery indicating that Governor Caperton has personal knowledge relevant to this matter, Arnold (or the Commission) may then conduct an oral deposition under W. Va. R. Civ. P. 30.

**600**

## III.

### CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Kanawha County is affirmed with respect to, *inter alia*, its conclusion that the Lottery Commission is immune from suit based upon constitutional immunity. The circuit court is reversed as to its determination regarding the existence of insurance coverage, and this case is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Justice WORKMAN, deeming herself disqualified, did not participate in the decision in this case.

Justice SCOTT did not participate in the decision in this case.

Judge FRED RISOVICH II, sitting by temporary assignment.